IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN THE MATTER OF THE SEARCH OF:

**DANIEL J. DELLICH; DOB 03/15/1975**          Magistrate No.  21-1704
                                               **[UNDER SEAL]**

**522 HARRISVILLE RD, BOYERS, PA 16020**       Magistrate No.  21-1705
                                               **[UNDER SEAL]**

**524 HARRISVILLE RD, BOYERS, PA 16020**       Magistrate No.  21-1706
                                               **[UNDER SEAL]**

### AFFIDAVIT/APPLICATION FOR SEARCH WARRANTS

I, Ryan Melder, being duly sworn, state as follows:

### AFFIANT TRAINING AND EXPERIENCE

I am a Special Agent with the Federal Bureau of Investigation.  I am a "federal law enforcement officer" within the meaning of Fed. R. Crim. P. 41(a)(2)(C); that is, a federal agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

I have been directly involved in narcotics and firearms-related arrests and the service of narcotics and firearms-related search warrants. I have participated in handling cooperating sources of information who were involved in narcotics acquisition and/or trafficking.  In addition, I have reviewed thousands of communications between drug traffickers as a result of my participation in multiple wiretap investigations, and I have had many conversations with drug traffickers and users as well as with other law enforcement officers about the methods and language used by traffickers to smuggle, store, and distribute drugs, collect and launder drug proceeds, and avoid getting caught by law enforcement officers.  As a result of my narcotics-related training and experience, I am familiar with the methods and language used to distribute narcotics, to launder proceeds, and to

operate drug-trafficking conspiracies.

Drug traffickers commonly conceal their activities from members of the public by transacting their business in a covert manner and/or during the nighttime hours when darkness helps to conceal their activities. In addition, large-scale drug traffickers often have multiple locations (including businesses, residences, and/or "stash houses") from which they operate their illegal activities and in which they maintain evidence of said illegal activities. Based on my training and experience I am aware that it is also typical for drug traffickers to carry their cellphones while maintaining these locations.

## SEARCH LOCATION

I am currently participating in an investigation of Daniel DELLICH for violating 21 U.S.C. §§ 841, 843, and 846, and 18 U.S.C. § 922(g)(1). This affidavit and application are submitted for search warrants for the following person and locations:

(1) DANIEL J. DELLICH; DOB 03/15/1975, as further described in Section I of Attachment A to seize items described in Section II of Attachment A;

(2) 522 Harrisville Road, Boyers, PA 16020 (hereafter referred to as **SEARCH LOCATION 1**), as further described in Section I of Attachment B, to seize items described in Section II of Attachment B; and

(3) 524 Harrisville Road, Boyers, PA 16020 (hereafter referred to as **SEARCH LOCATION 2**) as described in Section I of Attachment C to seize items described in Section II of Attachment C.

I have personally participated in the investigation detailed herein. In addition, I have discussed the investigation with and/or reviewed the reports of other officers who have been

involved in this investigation.  This affidavit is being submitted for the specific purpose stated herein.  I have not, therefore, included every fact known to me concerning the investigation.

### EVIDENCE COMMONLY GENERATED BY DRUG TRAFFICKING

As a result of my training and experience, I am aware that people who are involved in trafficking illegal drugs commonly store items related to their drug trafficking at their residences or garages or at the residences of relatives or other trusted associates.  I am also aware that the following kinds of evidence have been recovered in a substantial number of residential/stash house, vehicle, and personal searches conducted in connection with drug trafficking investigations:

1)  controlled substances;

2)  paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, plastic bags, stamp bags, microwave ovens, heat-sealing devices, and diluents such as mannitol, mannite, and inositol;

3)  books, records, receipts, notes, ledgers, letters, and other papers relating to the distribution of controlled substances, travel for the purpose of acquiring and/or distributing controlled substances, and to monetary transactions involving the proceeds from the sale of controlled substances;

4)  personal books, papers, cell phones, and other electronic devices reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances, unlawful firearm possession, money laundering, and the criminal use of communication facilities;

3

5)  cash, currency, and records relating to the generation of income and the expenditure of such income (including income from the sale of controlled substances), including money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, check registers, and tax return information, as well as consumer items such as electronic equipment, vehicles, jewelry, and precious metals, such as gold and silver, and precious gems, such as diamonds;

6)  documents and other records indicating travel in interstate and foreign commerce, such as maps, GPS coordinates, navigation coordinates, travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills and related communications;

7) computers, cellular telephones, electronic tablet devices, and other electronic media utilized for communication, transportation, and data acquisition and retention purposes related to acquiring and distributing illegal drugs and proceeds, unlawful firearm possession, and money laundering; including incoming and outgoing call and text message logs, contact lists, photo and video galleries, sent and received text messages, online searches and sites viewed via the internet, online or electronic communications sent and received (including email, chat, and instant messages), sent and received audio files, navigation, mapping, and GPS files, telephone settings (including contact lists), and related identifying information such as telephone identification numbers, call forwarding information, messages drafted but not sent, and voice messages;

8)  firearms and other dangerous weapons;

4

9)  identification evidence and/or indicia, such as cell phones with particular numbers, mail, deeds, leases, rental agreements, photographs, bills, and identification documents, that tend to identify the person(s) in residence, occupancy, control, or ownership of subject premises and/or subject communication devices; and

10) evidence that rebuts common defenses, such as evidence that demonstrates drugs were not possessed for personal use and the absence of legitimate income to cover expenses.

Based upon my training and experience, as well as the collective knowledge and experience of other officers involved in this investigation, I am aware that it is generally a common practice for drug traffickers to store their drug inventory, drug paraphernalia, drug proceeds, drug records, cell phones, and weapons at or in their residences and stash houses (including garages, outbuildings, and nearby vehicles) or at or in the residences and vehicles of relatives or other trusted associates.  Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, and/or will be "fronted" controlled substances from their suppliers, record keeping is necessary to keep track of amounts paid and owed, and such records will be maintained close at hand so as to readily ascertain current balances and to keep track of how proceeds are being expended.  Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past and for payments expected as to the traffickers' suppliers and the traffickers' dealers.

It is also a generally common practice for traffickers to conceal inside their residences or stash houses or businesses or vehicles, or inside the residences or businesses or vehicles of relatives or trusted associates, large sums of money, either the proceeds from drug sales or moneys to be

5

used to purchase controlled substances.  Drug traffickers sometimes make use of wire transfers, cashier's checks, and money orders to pay for controlled substances.  Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking and money laundering would also typically be maintained in the residences, stash houses, businesses, or vehicles of those involved in selling drugs or their relatives or trusted associates.

When drug traffickers amass proceeds from the sale of drugs, they often attempt to launder/legitimize these profits, or otherwise conceal them from discovery by law enforcement. In an effort to accomplish these goals, drug traffickers often place assets, such as vehicles and residences, in the names of other persons to conceal their true ownership and the manner in which they were acquired.  Records reflecting the implementation of such deceptive practices, such as deeds, titles, and service records, are likely to be found either inside the residence, business, or vehicle of the drug trafficker or inside the residence, business, or vehicle of the person in whose name the asset is listed.

Drug traffickers often possess firearms, ammunition, and other dangerous weapons to protect their proceeds, product, and person from others who might attempt to rob them, and to enforce payment from their customers.  Drug traffickers do not typically call the police when they are robbed of their drugs or drug proceeds and they do not typically file lawsuits to recover unpaid drug debts.  As a result, it is common for drug traffickers to arm themselves instead of calling the police or seeking legal recourse.  And because their drug trafficking activities are conducted over an extended period of time, drug traffickers possess firearms, ammunition, and other dangerous weapons for extended periods of time in convenient and safe locations such as their residences, stash houses, businesses, and vehicles.

Drug traffickers often operate under assumed names to conceal their true identities from law enforcement officers.  In so doing, they may acquire property, services, and personal identification items under their assumed or alias names.  They maintain such items, as well as records relating to such items, in their residences, businesses, and vehicles, together with evidence of their true identities.

## EVIDENCE COMMONLY LOCATED ON CELL PHONES

I am aware, based upon my training and experience, that the cell phone, in addition to weapons, is a primary tool of the drug trade.  Drug traffickers must maintain telephone listings of the numbers for customers and suppliers to efficiently conduct their drug trafficking business.  Often sent or received text messages and call logs reflecting sent or received calls to/from customers and/or suppliers are stored on cell phones.  The data on current or past cell phones can be particularly strong evidence of drug trafficking and, at the very least, can link a particular drug trafficker to prior communications setting up and/or completing prior drug transactions.

Moreover, drug traffickers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking activities and must keep these telephones in their actual (on their persons) or constructive (in their vehicles, residences, and businesses) possession to have ready access to them.  It is common for these cellular telephones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and businesses.  Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them.  Therefore, while it is common for drug traffickers to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones.  As a result, I am aware that collections of cell phones

have been found during drug trafficking search warrants that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been retained.

I am also aware that drug traffickers sometimes take trophy photographs of their drugs, drug proceeds, and firearms and retain the photographs in their residences or on their computers, cell phones, cameras, or other electronic storage devices. I am also aware that drug traffickers, like law-abiding citizens, sometimes take photographs of themselves with their friends, relatives, and associates and keep the photographs in their residences. When they are taken or retained by drug traffickers, such photographs can be evidence, or can lead to evidence, of drug trafficking and money laundering by identifying closely associated people who are actively assisting and/or supporting the drug trafficking activity.

It is now common for drug traffickers to have email accounts or various apps for cell phones that facilitate communications as well as the acquisition and expenditure of drug trafficking proceeds. Evidence of drug crimes can be found in cell phones/computers/electronic media referenced in the preceding paragraphs. Such evidence can include internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well as incriminating communications via emails or instant messages. It should be noted that, with the advance of technology, the distinction between computers and cellular telephones is quickly becoming less clear. Actions such as internet searching or emailing, in addition to calling and text messaging, can now be performed from many cell phones. In addition, those involved in drug trafficking crimes commonly communicate using multiple cellular telephones. Simultaneous possession of multiple cellular telephones is, therefore, evidence of drug trafficking. Moreover, the particular numbers of, and the particular numbers dialed by, particular cellular telephones can be evidence of drug

trafficking.  Such numbers can confirm identities of particular speakers and the occurrence of certain events.

As with most electronic/digital technology items, communications made from an electronic device, such as a computer or a cell phone, are often saved or stored on the device.  Storing this information can be intentional, for example, by saving an e-mail as a file on a computer or saving the location of one's favorite websites in "bookmarked" files.  Digital information can also be retained unintentionally.

Traces of the path of an electronic communication or of an internet search may be automatically stored in many places on a computer or a cell phone.  In addition to electronic communications, a user's Internet activities generally leave traces in the web cache and Internet history files.  A forensic examiner often can recover evidence that shows when and in what manner a user of an electronic device, such as a computer or a cell phone, used such a device.

Electronic files or remnants of such files can be recovered months or even years after they have been downloaded, deleted, or viewed via the Internet.  Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they often can be recovered months or years later using readily available forensic tools.  When a person "deletes" a file on an electronic storage device such as a computer, the data contained in the file often does not actually disappear; rather, that data often remains on the device until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on a device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are often

automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from an electronic storage device depends less on when the file was sent, downloaded, or viewed than on a particular user's operating system, storage capacity, and habits.

Based on my training and experience, I am aware that each of the following parts of a cell phone is likely to contain evidence of the crimes referenced herein. Such evidence can extend beyond evidence that directly establishes what crime was committed and by whom to evidence that establishes who used the cell phone and/or when and/or from where. Such cell-phone attribution evidence is particularly important because it links the user of the subject cell phone to the substantive evidence on the subject cell phone; it can link other users of other cell phones to the substantive evidence on the subject cell phone; and it can link the user of the subject cell phone to the location where the subject cell phone was found or where the subject cell phone was previously located based on location information stored on the cell phone. Moreover, parts of a cell phone that demonstrate the use of the cell phone to perform functions beyond communicating and recording photos/videos, such as to search the Internet or find addresses/directions, can be important to an investigation of the crimes referenced herein because cell phones are frequently used to prepare for crimes (e.g., to shop for tools of the particular criminal trade) and to complete individual criminal acts (e.g., travel to/from the location of the particular crime).

(1)     incoming and outgoing call and text message logs

(2)     contact lists

(3)     photo and video galleries

(4)    sent and received text messages

(5)    online searches and sites viewed via the internet

(6)    online or electronic communications sent and received, including email, chat, and instant messages

(7)    sent and received audio files

(8)    navigation, mapping, and GPS files

(9)    telephone settings, including speed dial numbers and the telephone number for the subject telephone and related identifying information such as the ESN for the telephone

(10)   call forwarding information

(11)   messages drafted but not sent

(12)   voice messages

## PROBABLE CAUSE

This investigation is the result of efforts by the Pennsylvania State Police (PSP), and the FBI to investigate and prosecute individuals involved and/or associated with the DELLICH Drug Trafficking Organization (DTO), which is known by law enforcement to engage in drug trafficking in the Western District of Pennsylvania.

### Recidivism

In May 2019, the Pennsylvania State Police (PSP) charged DELLICH with a felony drug trafficking offense at Docket No. CP-10-CR-0001186-2019, Court of Common Pleas, Butler County. In January 2020, the PSP again charged DELLICH with a felony drug trafficking offense at Docket No. CP-10-CR-0000253-2020, Court of Common Pleas, Butler County. DELLICH pled guilty at each case in March 2021, and he was sentenced to 9 months of imprisonment, 30 days of

house arrest, and 30 months of probation. DELLICH is currently on house arrest with work release and wears a GPS monitored ankle bracelet.

## Control Buys

In November 2020, investigators received information from a Confidential Informant (hereinafter referred to as "CI 1") that DELLICH was involved in illegal drug trafficking in the Boyers area of Butler County, Pennsylvania.  CI 1 related that DELLICH would sell crystal methamphetamine out of a garage located at 150 station road, Forestville, PA, as well as his residence located at 522 Harrisville Road, Boyers, PA 16020 (**SEARCH LOCATION 1**). CI 1 was provided a PA DMV photograph of DELLICH with biographical information concealed, and he identified the depicted individual as DELLICH.

In December 2020, CI 1 was utilized to conduct a controlled purchase of crystal methamphetamine from DELLICH.  To facilitate the purchase of narcotics CI 1 contacted DELLICH via Facebook Messenger[1] under the username "Dan Dellich".  DELLICH provided CI 1 a time and location to meet via Facebook Messenger.  CI 1 was provided pre-recorded funds and went to the location with an undercover officer in the vehicle.  Investigators observed CI 1 reach into the open driver side window of DELLICH's white Ford Truck (PA ZPV7813) and observed DELLICH in the driver's seat of the truck.  CI 1 then returned to the vehicle with the undercover officer and went to a pre-determined location.  CI 1 provided investigators with paper containing

---

[1]      Your Affiant is aware that Facebook Messenger is a free messaging application and platform created by Facebook, which enables users to communicate with other users via text messages, voice-to-voice calls as well as video calls.

suspected crystal methamphetamine. The methamphetamine was entered into evidence and subsequently submitted to the state police crime lab for analysis.

In January 2021, investigators again utilized CI 1 to conduct a controlled purchase of crystal methamphetamine from DELLICH at his garage building located across the road from **SEARCH LOCATION 1**. Investigators provided CI 1 pre-recorded funds and went to the location with an undercover officer in the vehicle. Investigators observed DELLICH and CI 1 walk into his garage building located across the road from **SEARCH LOCATION 1**. CI 1 returned to the vehicle with the undercover officer less than five minutes later. CI 1 and the undercover officer then went to a predetermined location.

CI 1 related that he/she and DELLICH walked inside the smaller and northern most of 3 tan garage/pole buildings located across the road from **SEARCH LOCATION 1**. DELLICH pulled out a plastic bag with approximately an ounce of crystal methamphetamine and a scale from his pocket. DELLICH then weighed out and provided the crystal methamphetamine to CI 1 in exchange for the pre-recorded confidential funds. CI 1 then walked back to the undercover officer and left.

In March 2021, investigators utilized a confidential informant (hereinafter referred to as "CI 2") to conduct a controlled purchase of crystal methamphetamine. CI 2 and DELLICH discussed a time and location to meet via Facebook Messenger. CI 2 was provided pre-recorded funds and went to the location followed by undercover officers. Investigators observed CI 2 walk into the garage bay door of the smaller and northern most of 3 tan garage/pole buildings, located across the street from **SEARCH LOCATION 1** and then back to his/her vehicle. Shortly after, law enforcement observed DELLICH arrive in his white Ford Pickup (PA ZPV7813) and park. DELLICH then walked with CI 2 into the front door of **SEARCH LOCATION 1**. CI 2 then

13

exited the front door, returned to the vehicle, and went to a pre-determined location with investigators maintaining surveillance.

CI 2 related that he/she walked inside the garage/pole building and did not find DELLICH. CI 2 then returned to the vehicle and DELLICH arrived shortly thereafter. CI 2 then walked with DELLICH inside **SEARCH LOCATION 1**, and DELLICH provided CI 2 with a plastic bag of methamphetamine in exchange for the pre-recorded funds. CI 2 then walked back to the vehicle and left.

In March 2021, investigators again utilized CI 2 to conduct a controlled purchase of crystal methamphetamine. CI 2 and DELLICH discussed a time and location to meet via Facebook Messenger. CI 2 was provided pre-recorded funds and went to the location followed by undercover officers. Physical surveillance observed DELLICH arrive at the garage in a green tractor trailer truck, across from **SEARCH LOCATION 1**, approximately forty-five minutes before CI 2 arrived. DELLICH then walked from the tractor trailer to **SEARCH LOCATION 1**.

Once CI 2 arrived, he/she was observed walking into the garage bay door of the smaller and northern most of 3 tan garage buildings across from **SEARCH LOCATION 1**. CI 2 exited through the garage bay door a short time later, returned to the vehicle and drove to a pre-determined location with undercover officers maintaining surveillance.

CI 2 related that he/she walked into the garage where DELLICH was and gave DELLICH the pre-recorded confidential funds. DELLICH then walked to a green tractor trailer truck which was parked to the east of the garages / pole buildings and weighed out the meth inside the cab of the truck. DELLICH then handed CI 2 a foil bag with crystal methamphetamine. CI 2 then left in the vehicle and drove to the pre-arranged meeting place.

In April 2021, investigators again utilized CI 2 to conduct a controlled purchase of crystal methamphetamine.  CI 2 and DELLICH discussed a time and location to meet via Facebook Messenger. CI 2 was provided with pre-recorded funds and drove to the location with undercover officers maintaining surveillance.  CI 2 parked across the road from **SEARCH LOCATION 1** near a garage/pole building and parked.  CI 2 walked across the street to **SEARCH LOCATION 1** and entered the front door. DELLICH and CI 2 then exited **SEARCH LOCATION 1** and departed the area in DELLICH's white Ford F-150 pickup truck. Approximately forty-five minutes later, DELLICH and CI 2 arrived back at **SEARCH LOCATION 1** and walked inside. CI 2 then exited the residence and drove to a pre-arranged location with undercover officers maintaining surveillance.

CI 2 related that he/she parked and walked into the house where DELLICH was. DELLICH told him/her that they "had to get it," or words to that effect. DELLICH and CI 2 then drove to an unknown location where DELLICH got out of his truck and dealt with an unknown male. DELLICH and CI 2 then drove back to **SEARCH LOCATION 1**. CI 2 and DELLICH walked inside where DELLICH weighed-out crystal meth and sold same in exchange for the pre-recorded confidential funds. CI 2 then left and drove to the pre-arranged meeting place.

On August 12, 2021 investigators utilized CI 2 to conduct a controlled purchase of crystal methamphetamine.  CI 2 and DELLICH discussed a time and location to meet via Facebook Messenger.  Portions of the chat(s) between DELLICH and CI 2 are below:

**CI 2**:  Hey you home cause I'm getting ready to head that way if you are

**Dellich**:  Not yet

**Dellich**:  I'm just crossing in pa from West Virginia and I got to load yet and get fuel

**CI 2**: Ok so probably hour and a half??

15

**Dellich:**  It will probably be around 830 or 9

**CI 2:** wya now

**CI 2**: Can I meet you somewhere

**CI 2**: I'm coming down 79 so I could meet you along 79 or is it at home

**Dellich:**  It's at home and I'm around Pittsburgh yet

**CI 2:**  Ok well I'll leave now then and meet you at your place.  It shouldn't take 2 hours to get back from Pittsburgh….. how much you want for that quarter?

**CI 2:**  I need to know how much to pull out of the bank before I come

**Dellich**: 3

**CI 2:** Ok cool.  You think you can be back by 745 or 8 if I'm lucky please.

**Dellich:**  Be at my place at 745.

Based upon my training and experience, when CI 2 asked DELLICH how much for that quarter, he/she is inquiring how much money for approximately 7 grams of methamphetamine. To which DELLICH replied 3, meaning $300.00.  In addition, DELLICH indicated to CI 2 that he did not have the narcotics on him, but they were located at **SEARCH LOCATION 1.**

   CI 2 was provided with pre-recorded funds and drove with an undercover officer to the meeting location, while investigators-maintained surveillance.  The undercover officer and CI 2 parked across the street from **SEARCH LOCATION 1** near the garages on the property.  CI 2 then exited the vehicle and walked inside the tan garage / pole building.   Approximately twelve minutes later, CI 2 returned to the vehicle driven by the undercover officer and drove to a pre-arranged meeting location.

   During the controlled purchase, investigators observed a white Chrysler 300, DELLICH's yellow tractor trailer truck, and DELLICH's green tractor trailer truck all parked to the east of the

16

garage / pole building.  In addition, DELLICH's white Ford pickup was parked in front of **SEARCH LOCATION 1** with the passenger door open.

CI 2 was debriefed and related the following: CI 2 parked and walked into the garage where DELLICH was waiting. DELLICH handed the packaged methamphetamine CI 2 in exchange for the pre-recorded confidential funds. CI 2 then made small talk with DELLICH for a few minutes and returned to the vehicle driven by an undercover officer.

During the course of the investigation, physical surveillance observed DELLICH utilize, on separate occasions, his white F-150 Ford pickup truck, green tractor trailer, and yellow tractor trailer truck. According to his probation officer, DELLICH drives tractor trailers as part of his employment. Furthermore, the nature of DELLICH's employment provides him a much greater freedom of movement than others on house arrest. Given DELLICH's use of these vehicles in relation to the above described controlled buys, your Affiant submits that DELLICH utilizes his vehicles to transport controlled substances onto **SEARCH LOCATION 1**. As described in Section I of Attachment B, your Affiant seeks to search these three vehicles as part of the search upon **SEARCH LOCATION 1**.

### House Arrest Violation

On August 18, 2021, your Affiant spoke to DELLICH's probation officer. According to the probation officer, DELLICH participated in a urinalysis and tested positive for methamphetamine on August 18, 2021. As discussed above, DELLICH is on location monitoring and house arrest. Thus, your Affiant submits that DELLICH is using and currently has access to methamphetamine and that there is probable cause to believe that methamphetamine is located on DELLICH's person and in **SEARCH LOCATION 1**.

**Facebook Inc. Search Warrant Chat(s)**

On July 6, 2021, investigators served a search warrant to Facebook INC. for DELLICH's Facebook account.  Investigators collected personal identifying information, activity logs, photos, messages, as well as other records.  On May 3, 2021, DELLICH communicated with Roy WELTZ via Facebook messenger.  WELTZ is known to investigators as a possible source of supply for DELLICH.  The relevant communication are as follows:

**Weltz:**  Hey can I stop by and borrow that thing I sold you I have 600 reasons of mine that needs it.

**Dellich:**  Its put away in the volt in parents house I cant have any guns around

**Weltz**: Well guess im going empty handed feels like a good night to die

**Dellich:** Where are u going

**Weltz:** Somewhere in slippery rock to meet Codi Hockenberry

**Dellich:** And you need a gun

**Weltz:** Yes because some dude that is strapped is with him.

**Dellich:** That wouldn't scare me pick me up ill fight him

Based upon my training and experience, as well mine and other investigator's knowledge in this case, WELTZ sold a firearm to DELLICH and asked him to borrow it.  DELLICH told WELTZ it is in his parent's vault (**SEARCH LOCATION 2)** because he is not permitted to possess firearms due to the above-mentioned felony convictions and conditions of house arrest.  It is believed that DELLICH still has access to this firearm, and that his possession is in violation of 18 U.S.C. 922(g)(1).

## CONCLUSION

Based on my training and experience, and the foregoing facts, there is probable cause to believe that DELLICH has committed and continues to commit violations of 21 U.S.C. §§ 841, 843, and 846, and 18 U.S.C. § 922(g)(1) in the Western District of Pennsylvania. Moreover, evidence of these crimes will be located on/in **DANIEL J. DELLICH, SEARCH LOCATION 1,** and **SEARCH LOCATION 2**. Therefore, I respectfully request that search warrants be issued for the person described in Section I of Attachment A and the locations described in Section I of Attachments B and C for the property, records, and other information described in Section II of those Attachments.

The above information is true and correct to the best of my knowledge, information, and belief.

_s/ Ryan Melder_
Special Agent, FBI

Sworn and subscribed before me, by telephone
pursuant to Fed.R.Crim.P. 4.1(b)(2)(A),
this 23rd day of August 2021.

_____
THE HONORABLE PATRICIA L. DODGE
UNITED STATES MAGISTRATE JUDGE

19

## ATTACHMENT A

### I. Person to be Searched

The person to be searched **is DANIEL J. DELLICH**, a male born on March 15, 1975, including all personal items and containers in his physical possession, on his person, or in areas within his immediate control.

### II.  Property, Records, and Other Information to Be Seized

1)      controlled substances;

2)      paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, plastic bags, stamp bags, microwave ovens, heat-sealing devices, and diluents such as mannitol, mannite, and inositol;

3)      books, records, receipts, notes, ledgers, letters, and other papers relating to the distribution of controlled substances, travel for the purpose of acquiring and/or distributing controlled substances, and to monetary transactions involving the proceeds from the sale of controlled substances;

4)      personal books, papers, cell phones, and other electronic devices;

5)      cash, currency, and records relating to the generation of income and the expenditure of such income (including income from the sale of controlled substances), including money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, check registers, and tax return information, as well as consumer items such as electronic equipment,

20

vehicles, jewelry, and precious metals such as gold and silver, and precious gems such as diamonds;

6)      documents and other records indicating travel in interstate and foreign commerce, such as maps, GPS coordinates, navigation coordinates, travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills and related communications;

7)      computers, cellular telephones, electronic tablet devices, and other electronic media; including any incoming and outgoing call and text message logs, contact lists, photo and video galleries, sent and received text messages, online searches and sites viewed via the internet, online or electronic communications sent and received (including email, chat, and instant messages), sent and received audio files, navigation, mapping, and GPS files, telephone settings (including contact lists), and related identifying information such as telephone identification numbers, call forwarding information, messages drafted but not sent, and voice messages;

8)      firearms and other dangerous weapons;

9)      identification evidence and/or indicia, such as cell phones with particular numbers, mail, deeds, leases, rental agreements, photographs, bills, and identification documents, that tend to identify the person(s) in residence, occupancy, control, or ownership of subject premises and/or subject communication devices; and

10)     evidence that rebuts common defenses, such as evidence that demonstrates drugs were not possessed for personal use and the absence of legitimate income to cover expenses.

As used above, the terms "records" and "documents" include all of the foregoing

items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.  However, no real-time communications will be intercepted and searched during service.

In searching electronic devices, federal agents may examine all of the data contained in such a device to view its precise contents and determine whether the device and/or data falls within the items to be seized as set forth above.  In addition, they may search for and attempt to recover "deleted," "hidden" or encrypted data to determine whether the data falls within the list of items to be seized as set forth above.

## ATTACHMENT B

### I. Location to be Searched

**SEARCH LOCATION 1,** located at 522 Harrisville Road, Boyers, PA 16020, is a single-family residence; to include multiple garages / pole barns and vehicles within the curtilage of the property.  The residence is circled in "red" and the garages / pole barns on the property are circled in "yellow". The vehicles specifically authorized under this search warrant are a white F-150 Ford pickup truck, green tractor trailer, and yellow tractor trailer truck parked in front of the residence and across from the garages / pole barns.



### II.  Property, Records, and Other Information to Be Seized

      1)      controlled substances;

2)      paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, plastic bags, stamp bags, microwave ovens, heat-sealing devices, and diluents such as mannitol, mannite, and inositol;

3)      books, records, receipts, notes, ledgers, letters, and other papers relating to the distribution of controlled substances, travel for the purpose of acquiring and/or distributing controlled substances, and to monetary transactions involving the proceeds from the sale of controlled substances;

4)      personal books, papers, cell phones, and other electronic devices;

5)      cash, currency, and records relating to the generation of income and the expenditure of such income (including income from the sale of controlled substances), including money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, check registers, and tax return information, as well as consumer items such as electronic equipment, vehicles, jewelry, and precious metals such as gold and silver, and precious gems such as diamonds;

6)      documents and other records indicating travel in interstate and foreign commerce, such as maps, GPS coordinates, navigation coordinates, travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills and related communications;

7)      computers, cellular telephones, electronic tablet devices, and other electronic media; including any incoming and outgoing call and text message logs, contact lists, photo and

video galleries, sent and received text messages, online searches and sites viewed via the internet, online or electronic communications sent and received (including email, chat, and instant messages), sent and received audio files, navigation, mapping, and GPS files, telephone settings (including contact lists), and related identifying information such as telephone identification numbers, call forwarding information, messages drafted but not sent, and voice messages;

8)      firearms and other dangerous weapons;

9)      identification evidence and/or indicia, such as cell phones with particular numbers, mail, deeds, leases, rental agreements, photographs, bills, and identification documents, that tend to identify the person(s) in residence, occupancy, control, or ownership of subject premises and/or subject communication devices; and

10)     evidence that rebuts common defenses, such as evidence that demonstrates drugs were not possessed for personal use and the absence of legitimate income to cover expenses.

As used above, the terms "records" and "documents" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.  However, no real-time communications will be intercepted and searched during service.

In searching electronic devices, federal agents may examine all of the data contained in such a device to view its precise contents and determine whether the device and/or data falls within the items to be seized as set forth above.  In addition, they may search for and attempt to recover "deleted," "hidden" or encrypted data to determine whether the data falls within the list of items to be seized as set forth above.

25

## ATTACHMENT C

**I. Location to be Searched**

      **SEARCH LOCATION 2,** located at 524 Harrisville RD, Boyers, PA 16020, is a single-family residence.

**II. Property, Records, and Other Information to Be Seized**

1)      All records, receipts, notes, ledgers, letters, communications, firearm cases, owner's manuals, and other papers relating to the purchase of firearms, travel for the purpose of acquiring and/or transferring firearms, and to monetary transactions involving the proceeds from the subsequent sale of firearms; and

2)      Firearms and other dangerous weapons, ammunition, magazines, and gun locks.